UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WISCONSIN

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

UNITED STATES OF AMERICA,

       Plaintiff,

-vs-                             Case No. 16-MJ-58-SLC

ADRIAN JAIMES,               Madison, Wisconsin
                                June 14, 2016
       Defendant.          3:00 p.m.

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

STENOGRAPHIC TRANSCRIPT OF **AUDIO RECORDING**
DETENTION HEARING
HELD BEFORE THE HONORABLE STEPHEN L. CROCKER,


APPEARANCES:

For the Plaintiff:
               Office of the United States Attorney
               BY:  ELIZABETH ALTMAN
               Assistant United States Attorney
               660 West Washington Avenue
               Madison, Wisconsin  53703

For the Defendant:
               Federal Defender Services of Wisconsin
               Madison Branch Office
               BY:  PETER MOYERS
               22 East Mifflin Street, Ste. 1000
               Madison, Wisconsin  53703

Also appearing:
               Adrian Jaimes – defendant
               Ryan Plender – US Probation Officer

Lynette Swenson   RMR, CRR, CRC
U.S. District Court Federal Reporter
United States District Court
120 North Henry Street, Rm. 520
Madison, Wisconsin  53703
608-255-3821

# I-N-D-E-X

| DEFENDANT'S WITNESSES | EXAMINATION | PAGES |
|---|---|---|
| RUTH JAIMES | Direct by Mr. Moyers | 10-12 |
| CATALINO JAIMES | Direct by Mr. Moyers | 13-15 |

* * * * *

(Proceedings called to order.)

THE CLERK:  Case Number 16-MJ-58-SLC.  *United States of America v.* Adrian Jaimes.  Court is called for a detention hearing.  May we have the appearances, please.

MS. ALTMAN:  Good afternoon, Your Honor.  The United States appears by Elizabeth Altman.

MR. MOYERS:  Peter Moyers from Federal Defender Services and seated here to my right is Mr. Jaimes.

THE COURT:  All right.  Mr. Jaimes, good afternoon to you.

THE DEFENDANT:  Good afternoon.

THE COURT:  Thank you.  Mr. Moyers, Ms. Altman, good afternoon to both of you.  We also have Mr. Plender here on behalf of Pretrial Services.  Good afternoon.

AGENT:  Good afternoon, Your Honor.

THE COURT:  Thank you.  All right.  We're here for a hearing on Mr. Jaimes's motion for release on

1  conditions made orally at the initial appearance.  I've

2  received and read the Pretrial Service report, and

3  Mr. Moyers, I just want to confirm with you and I'm

4  checking the docket, you did not file any sort of a

5  written release plan; correct?

6          MR. MOYERS:  That's correct, Your Honor.

7          THE COURT:  Okay.  Did you want to proceed

8  orally this afternoon?

9          MR. MOYERS:  Yes, I would.

10          THE COURT:  Okay.  Let's just confirm, have you

11  had a chance to look at the Pretrial Service report and

12  talk to Mr. Jaimes about it?

13          MR. MOYERS:  Yes.  I've had a chance and we

14  discussed it.

15          THE COURT:  Okay.  Fair enough.  Ms. Altman, I

16  presume you've read it as well?

17          MS. ALTMAN:  Yes, Your Honor.

18          THE COURT:  Okay.  And again, simply to make the

19  record, Mr. Moyers, we talked about this briefly at the

20  initial appearance.  Did you want a probable cause

21  finding by the Court or are you willing to concede

22  probable cause for the purpose of today's hearing?

23          MR. MOYERS:  We're not asking you to dismiss the

24  Complaint, but we would like to talk about the evidence

25  in the case and the Complaint vis-a-vis detention.

4

1          THE COURT:  Understood.  But let's be clear,

2    you're certainly entitled to do that and the Court would

3    welcome that, but on a finding of probable cause based on

4    the Complaint, then the burden under the Bail Reform Act

5    is on Mr. Jaimes through counsel to prove that he's

6    neither a flight risk nor a danger and I assume from what

7    you're telling me that you accept that finding.

8          MR. MOYERS:  Yes.  That that would be our

9    burden?

10          THE COURT:  Correct.  That's all I'm saying.

11          MR. MOYERS:  Yep.  That's correct, Your Honor.

12          THE COURT:  Very well.  Then let's proceed.

13    Mr. Moyers, how would you like to present your plan?

14          MR. MOYERS:  I guess first things first.  I'll

15    go through -- we'll go through the evidence or at least

16    the affidavit and then we'll move on to the Pretrial

17    Services report --

18          THE COURT:  As you wish.

19          MR. MOYERS:  -- with -- as a matter of probable

20    cause or evidence here, I would point out that the

21    affidavit attached to the Complaint doesn't really get us

22    to probable cause.

23          THE COURT:  Mr. Moyers, let me stop you there.

24    We're not going to start at the beginning.  If and when

25    you ever want to file a motion to suppress or to quash a

warrant, that would be the appropriate time.  According
to the Pretrial Service report, Mr. Jaimes admitted that
he had done this, admitted that there were multiple
victims, and they found over 100 pictures of minor
victims on his computer.  That's the starting point.

MR. MOYERS:  So the Court is not interested in
whether the affidavit was sufficient to issue the
Complaint in the first place?

THE COURT:  Exactly right.  Exactly right.
Please continue.

MR. MOYERS:  Okay.  Well, in that case, Your
Honor, with the Pretrial Services report, what we have
here is, as I understand it, the probation office thinks
they can mitigate the risk of flight.  So what we're
really focused on here is dangerousness and our position
is that the reasoning of the Pretrial Services report
isn't terrific.  First of all, it proves too much.
Basically the upshot of what they're saying is well,
given -- here I'm reading from page three, this is Docket
No. 4, "Assessment of Danger.  Given the ubiquity of
mobile devices with access to the internet and the
difficulty inherent in monitoring those devices, there is
a significant risk that the defendant could continue the
behavior alleged in the complaint undetected."  That's
going to apply to anybody who uses a mobile device,

tablet to engage -- to transmit contraband or images of

child pornography or videos over the internet.

And I would point out that this same argument would

apply to almost anything else.  For instance, given the

ubiquity of guns and the difficulty inherent in

monitoring all those guns, there's a significant risk

that the defendant could continue the behavior alleged in

the complaint undetected.  Or given the ubiquity of banks

and the difficulty inherent in monitoring all those

banks, there's a significant risk that the defendant

could continue to rob banks as alleged in the complaint.

THE COURT:  Well, I understand the rhetorical

device of *reductio ad absurdeum*, but it's a *nonsequitur*

here.  The ubiquity of electronic devices is palpable and

the question is not is that an incorrect statement,

because it is a correct statement.  The question is how

do we account for that risk here.

MR. MOYERS:  Well, I think that you can tailor a

number of conditions.  First of all, you can forbid him

from using anything connected to the internet.  That's

the first condition.

Second of all, we can have -- and I'm going to ask

his parents to come up and testify to tell you that they

would be willing and motivated to report to Mr. Plender

if they ever saw him with any device.  As their testimony

will show when I have them come up here, Mr. Jaimes works

with his father at the same -- for the same employer.

His dad is the head chef at the Bull's Eye Country Club.

Mr. Jaimes is a server and bartender.

Now, his mother was working until recently, but she

was laid off from Head Start in Wood County.  So she's

home a lot of the time now.  The point being is that

there are going to be people around him a lot.  It's not

as if we're sending him to some home on his own where

we'll just have to -- you know, where we'll just have to

rely on a rule like don't use the internet.  Here there

will be people looking at him all the time.

Second of all, you can impose a house arrest or a

curfew or just locations that he can go to to make sure

that he's not around anything where he would have access

to the internet.  And if he's just working or at home and

you can take the internet out of the home, then we've got

a lot of -- then he would have to go through some sort of

Herculean effort to get to the internet without his

parents knowing to commit this crime.  And I think there

we've minimized it about as far as we can.  Now,

whether -- the reason that should be sufficient is look,

he's got no other criminal history before.  It's not like

he's been engaging in criminal behavior all of his life.

Second of all, I don't have any evidence yet, at

1    least from the government, that he's -- that there are

2    any sort of other offenses or related sexual or contact

3    offenses that would pose other kinds of problems.

4              THE COURT:  And let me just make sure I'm

5    tracking here.

6              MR. MOYERS:  Yeah.

7              THE COURT:  The Complaint is limited to the one

8    known victim.

9              MR. MOYERS:  Yes.

10             THE COURT:  According to the Pretrial Service

11   report, and the Court doesn't get the reports and I'm not

12   sure if you've seen them yet either, but apparently

13   Mr. Jaimes admitted that there were five or six other

14   victims and apparently there's images of five other

15   victims.  So when you tell me there's no evidence of

16   other conduct, are you excluding this or are you

17   including that?

18             MR. MOYERS:  No hands-on contact.  So maybe that

19   was unclear.

20             THE COURT:  It was.  Okay.

21             MR. MOYERS:  Okay.  Yeah.  There's no other

22   hands-on contact.  But yeah, I take it that the Court

23   understands that they -- that according to the -- he said

24   five or six more.  They found four additional more in the

25   online drop box is my understanding.  So it's a total of

1    five over the period.  Frankly one or five, I don't think

2    that changes the dangerousness calculation.  Maybe a

3    little for multiple victims, but I think it's the

4    behavior itself that the Court has to assess.  And look,

5    if we take the internet out of the house, we give him

6    house arrest, we have his -- you know, we have, you know,

7    just a blanket bright-line rule no using any device that

8    connects to the internet, we've minimized substantially,

9    I would argue, the idea that he'll go out and reoffend.

10   So if the Court would like or I don't know if the Court

11   wants to hear from Ms. Altman first, but I'd like to call

12   his parents to testify.

13        THE COURT:  Well, certainly that's your

14   prerogative.  Of course you're welcome to do that.  What

15   I'd like you to do is present your entire argument for

16   release first and, of course, Ms. Altman will get a

17   chance to cross-examine if she chooses to.  And I'll let

18   Mr. Plender ask nonleading -- well, he can ask whatever

19   questions he wants on behalf of Pretrial Services.  But

20   then once you're completely done with your testimony and

21   any additional argument you'd like to make, then I'll

22   give the floor to Ms. Altman.

23        MR. MOYERS:  Understood.  Then I'll call them

24   now.

25        THE COURT:  Please do.

10

1      MR. MOYERS:  We'd call Ruth Jaimes to the stand.

2      **RUTH JAIMES, DEFENDANT'S WITNESS, SWORN,**

3                    DIRECT EXAMINATION

4  BY MR. MOYERS:

5  Q    Would you please state your name for the court and

6  spell your last.

7  A    Ruth Jaimes.  J-a-i-m-e-s.

8  Q    And you're Adrian Jaimes's -- the defendant's

9  mother; is that correct?

10 A    Yes, I am.

11 Q    And you live with him in Nekoosa?

12 A    Yes.

13 Q    Has he lived with you all of his life?

14 A    Yes.

15 Q    And how long have you lived in that house in

16 Nekoosa?

17 A    Little over ten years.

18 Q    And you're aware of what he's been charged with; is

19 that correct?

20 A    Yes.

21 Q    And you understand that the minimum penalty is 15

22 years?

23 A    Yes, I'm aware.

24 Q    And that the maximum would be 30 years.

25 A    Yes.

11

1  Q    Now, do you -- are you also aware that if he were

2  able to get out on pretrial release and committed another

3  crime, that there would be additional penalties?

4  A    Yes, I am aware.  I wouldn't allow that to happen.

5  Q    All right.  You love your son, don't you?

6  A    Yes, very much.

7  Q    But would you lie to Mr. Plender or any officer of

8  the court to help him?

9  A    No, I wouldn't.

10  Q    Why not?

11  A    Because I wouldn't want to get myself in trouble and

12  he shouldn't make another mistake.

13  Q    Would you be willing to remove the internet from

14  your home?

15  A    Yes.  It's in my name and I will disconnect it in a

16  half hour if I could or if I have to.

17  Q    And would you be willing to call Mr. Plender or any

18  court officer if you saw your son on any internet- --

19  A    Yes I would.

20  Q    -- capable device?  And so can you look the judge in

21  the eye and tell him that you would be willing to do

22  whatever it -- whatever was necessary, including report

23  him to Mr. Plender --

24  A    Yes.

25  Q    -- if you had to?

1  A     I would do anything.  Anything.

2           THE COURT:  And Mr. Moyers, whenever a mother or

3  father tells me these things, I always believe them.

4  Okay?  So we don't really need to establish that.  Let's

5  descend into the specifics if you've got them.

6  BY MR. MOYERS:

7  Q     You've been laid off; is that correct?

8  A     Yes.

9  Q     And you're home most of the day?

10  A     Yes.

11  Q     You have two other daughters in the house?

12  A     Yes.

13  Q     How old are they?

14  A     22 and 14.

15  Q     And is the 14-year-old still in school?

16  A     Yeah.  Well, she's out for the summer, but yes.

17  Q     So you're at home for most of the day?

18  A     Yes, I am.  I haven't been going nowhere.  I don't

19  normally do.

20  Q     And you sleep there at night?

21  A     Yes.

22           MR. MOYERS:  No further questions.

23           THE COURT:  Ms. Altman, did you have any

24  questions?

25           MS. ALTMAN:  No.  Thank you.

1          THE COURT:  Mr. Plender?

2          AGENT:  No, Your Honor.

3          THE COURT:  Okay.  Ms. Jaimes, I don't either.

4    So you're done.  Thank you.  Did you want to call the

5    father?

6          MR. MOYERS:  Just for the employment part.

7          THE COURT:  As you wish.

8       (Witness excused.)

9          MR. MOYERS:  We will call Catalino Jaimes.

10        **CATALINO JAIMES, DEFENDANT'S WITNESS, SWORN,**

11                     DIRECT EXAMINATION

12   BY MR. MOYERS:

13   Q    Please state your name and spell your last for the

14   court.

15   A    My name is Catalino Jaimes.  J-a-i-m-e-s.

16   Q    Mr. Jaimes, where are you employed?

17   A    Bull's Eye Country Club.

18   Q    And where is the Bull's Eye Country Club?

19   A    In Wisconsin Rapids.

20   Q    About how far is that from your home?

21   A    Seven, eight minutes.

22   Q    And does your son, Adrian Jaimes, work there as

23   well?

24   A    Yes.

25   Q    And what does he do?

1   A     He's a server and a bartender.

2   Q     Do you see him when you --

3   A     All the time.

4   Q     Let me finish.

5   A     Sorry.

6   Q     Do you see him at work?

7   A     Yeah.

8   Q     And do you go to work every day?

9   A     Five, six days a week, sometimes seven depending on

10  how busy we are for the summer.

11  Q     And how many days a week or hours per week does your

12  son work?

13  A     At the moment anywhere from 30 to 35.  Again,

14  sometimes five days a week, up to 45 to 50 depending on

15  the week.

16  Q     And what part of the day do you usually work?

17  A     I work 9 to 5 normally.  Or when we have parties on

18  the weekend it can go up to 8, 9, 10 o'clock at night.

19  Q     And when does -- when does Adrian typically work?

20  A     He works lunch hours or dinner hours.

21  Q     And I'll just ask would you be willing to report any

22  violation of any condition to Mr. Plender or any court

23  officer --

24  A     Yes.

25  Q     -- if he broke it?

1    A     Yes.

2              MR. MOYERS:  No further questions.

3              THE COURT:  Ms. Altman, any questions?

4              MS. ALTMAN:  No, Your Honor.  Thank you.

5              THE COURT:  Mr. Plender.

6              AGENT:  No, Your Honor.

7              THE COURT:  I don't either.  Mr. Jaimes, thank

8    you.  You may resume your seat as well.

9         (Witness excused at 3:19 p.m.)

10             THE COURT:  Mr. Moyers, do you have other

11   witnesses you wanted to present?

12             MR. MOYERS:  No, Your Honor.

13             THE COURT:  Do you have any additional argument

14   at this time before we hear from the government.

15             MR. MOYERS:  Just a little bit to make it very

16   clear because I want to focus in.  The conditions we're

17   proposing is, of course, the standard ones that we would

18   have in any case like this.  But that they would get the

19   internet -- they would remove the internet from the

20   house; that there's just a complete ban on any device,

21   whether or not it is hooked up to the internet, that he

22   can't be using it.  I don't even want him even internet

23   capable.  And we would suggest some sort of curfew or

24   house arrest to keep him at either work or at home or

25   religious services, if any, or to see me.

16

1        With that kind of lockdown, I think the Court can

2   have more than enough confidence that the risk here has

3   been mitigated.

4            THE COURT:  All right.  Well, thank you for your

5   input.  Ms. Altman, your input, please.

6            MS. ALTMAN:  Yes, Your Honor.  Thank you.  I'll

7   just start out by saying I have no doubt about the

8   defendant's parents' wishes and I don't doubt that they

9   want what's best for their son and that they would call

10  Mr. Plender or the Court if they saw a violation.  That,

11  however, in this particular case just simply is not

12  enough.

13       First of all, with regard to the nonappearance, I

14  understand that the Court thinks that it could or that

15  probation thinks that it could be mitigated.  This is a

16  15-year mandatory minimum and a 21-year-old kid.  I think

17  he's got a pretty good incentive to not show up.  Are

18  there some things that could mitigate that?  Sure.  GPS.

19  But if someone were to cut the GPS and make a run for it,

20  we simply know the last place they were.

21       That, of course, is not the primary consideration,

22  the primary issue that he should be detained, and that

23  is, of course, the danger to the community based on his

24  offense, and then I'll talk about why the plan doesn't

25  mitigate it.

1      As the Court has already mentioned and everybody is

2  aware, there are several victims in this case, not just

3  the one that started the investigation.  The agents found

4  at least four other boys' images contained within a

5  folder labeled *Kix vids*.  We know he's on Kix looking for

6  other victims.  There were images of our known victim

7  from the complaint and the search warrant in there.  And

8  I can't tell you that they are all child pornography.  It

9  says the video -- the folder contains 157 images with

10 them being faces, behinds and genitals.  So of those,

11 they're obviously not all going to qualify as child

12 pornography.  But that does not negate the fact that

13 there are five child victims of this defendant.

14     As the Court may recall from the search warrant,

15 this defendant did not take no for an answer very easily.

16 He was very persistent in his communications with the

17 victim in this case.  The victim saying no, I don't want

18 to send you any more pictures and the defendant saying

19 please.  One more.  One last one.  You'd make me the

20 happiest girl on earth.  The child says gosh, is that a

21 little hard core.  And the defendant says please, because

22 you like me.  And at the point when the child in this

23 case ended the contact, that was not enough for the

24 defendant.  He then took on a different persona to

25 continue to encourage the child in this case to continue

1    sending pictures to him.  So he doesn't really take no

2    for an answer.  I'm not sure that he's going to take what

3    this Court says as an answer either.

4         Ultimately, in addition to the danger, the problem

5    is the plan.  I understand the parents are going to be

6    around him a lot, but I disagree with defense counsel

7    that it's going to take a Herculean effort for him to

8    violate a court order and to get back online, back on

9    Kix, back in communication with these children.  You can

10   stop by a Best Buy and buy a prepaid phone on your way

11   home from work and you're back in business.

12        The defendant essentially proposes to continue his

13   regular routine, albeit with some house arrest or staying

14   home after dinner, but that still puts him in a country

15   club, outside of his parents' view.  The dad, I believe,

16   testified that he worked until 5 and defendant is there

17   dinner hours, so he's there without his father often or

18   at least occasionally.  And even when his father is

19   there, his father is busy in the kitchen.  I'm certain

20   he's not seeing all of the interactions that the

21   defendant is having with citizens, with people, with

22   someone who could bring him a phone, with children in the

23   country club that he could make contact with or befriend.

24   I just don't see this plan at all being feasible based on

25   its -- I don't want to say laxity, but sort of laxity,

1   and the crimes itself show that he is a danger to the

2   community, crimes themselves, I guess.

3            THE COURT:  All right.  Thank you.  Mr. Plender,

4   your report I think speaks for itself.  Did you want to

5   add anything in light of what you've heard so far from

6   Mr. Moyers or Ms. Altman?

7            AGENT:  No, Your Honor.  Nothing has changed our

8   recommendation at all.

9            THE COURT:  Okay.  Thank you.  Well, Mr. Moyers,

10  then I'll let you reply before I give you a ruling.

11  Anything else you'd like to offer in reply to the

12  government's response to your plan?

13           MR. MOYERS:  Just two items, Your Honor.  The

14  first is to the extent the Court is going to rely on a

15  search warrant that it may or may not have signed in that

16  affidavit that I haven't seen --

17           THE COURT:  You haven't seen the affidavit yet?

18           MR. MOYERS:  For the search warrant?

19           THE COURT:  Yeah.

20           MR. MOYERS:  No.

21           MS. ALTMAN:  I thought you had it last week.

22           THE COURT:  You should have gotten it at the

23  initial appearance.

24           MR. MOYERS:  I got a search warrant.  I did not

25  get an affidavit.

1          THE COURT:  Okay.  What were you going to run me

2 through then when I cut you off and said that we're not

3 dealing with probable cause?  The Complaint?

4          MR. MOYERS:  I thought I was going to go through

5 the Complaint --

6          THE COURT:  Okay.

7          MR. MOYERS:  -- and the arrest warrant.

8          THE COURT:  Okay.  Well, they're very similar.

9          MR. MOYERS:  I gathered they might be.

10          THE COURT:  Well, certainly you're entitled to

11 that.  But in any event, let's keep going today.

12          MR. MOYERS:  And look, I don't know.  I can't

13 tell you.  But if there are further facts about how he

14 wouldn't take no for an answer or about his conduct here,

15 I don't think the Court should rely on it certainly until

16 I've seen it.

17     And second of all, to describe this plan as lax I

18 think is too much.  I think what the -- we -- the focus

19 of what the Court would be struggling with here is given

20 the gravity of this kind of crime and that there are just

21 internet devices, ready-internet devices are easy to

22 purchase, I wouldn't call them inexpensive, but it can be

23 done, whether or not there's just -- there are conditions

24 the Court can design or that are practically realizable.

25 And I think what we've got here is the sort of scenarios

1   that the government is suggesting of now sneaking out, I

2   don't know, between tables at work or stopping by, you

3   know, Best Buy when he's on GPS monitoring.  You could

4   even say that his mom or dad has to drive him to and from

5   work.  That's minimizing it and I mean it's restricting

6   his -- restricting his movement and even just generally

7   his, like his behavior, his conduct, what he can actually

8   do to such a degree that the Court should have tons of

9   confidence that the risk here has been minimized.

10          THE COURT:  All right.  Well, thank you for your

11  input, Mr. Moyers.  And you've done the best job you can

12  with what you've got so far.  I'm not going to release

13  Mr. Jaimes today and I'll explain my thought process

14  momentarily.  But I want to make clear that this is

15  subject to reconsideration as more information becomes

16  available to everybody:  To you, to the government, and

17  to Pretrial Services.  And I don't know, it may go the

18  other direction.  It may be that we learn more things

19  that make Mr. Jaimes even more of a risk for release, but

20  at least hypothetically there could be a plan.  But this

21  isn't it.

22      So let's back up a bit.  The Court often describes

23  releasing a defendant on a plan as a two-way street.

24  You've got to have a good plan, but you also have to have

25  a defendant whom the Court trusts enough to follow the

22

plan.  We don't know enough about Mr. Jaimes, Mr. Adrian
Jaimes, for the Court to do that.  Right now he's a syper
to the court.  He's 21 years old.  He's presumed innocent
of the charges.  There hasn't even been an Indictment
yet.  But for the purposes of probable cause and based on
the information in the Complaint, it appears that
Mr. Jaimes engaged in very calculated, manipulative
behavior.  I think devious is not too strong a word;
pretending to be two different people in order to
triangulate his victim, both the brother and the sister
who each would wheedle and cajole the victim to send more
pictures.  That's very manipulative.  That's very clever
in an evil way.  So what makes him tick?  What makes the
Court think that he wouldn't manipulate or be devious or
try to wheedle his way out of conditions or keep doing
what he's doing?

        Following at that same path a little bit further, we
don't know the depth of his need or wish to look at
pictures of prepubescent boys.  Apparently, and again
he's presumed innocent of charges and certainly there's
no complaint or Indictment charging any of these other
victims, but apparently he collects the pictures.  He's
got over 100 images, not all of which would qualify as
child pornography, but it's not enough to have one.  He's
very similar to a defendant named Thomas Valley who was

in this court who took on false personae to wheedle his

victims into sending him naked pictures.  Again, a man

who had ultimately what were found by a professional to

be very serious psychological problems.

So a prerequisite for the Court to consider

releasing Mr. Jaimes would be an evaluation by a trained

professional.  What are we dealing with here?  Who is

Adrian Jaimes?  Can we trust him?  What sorts of

sociological or psychological problems are we dealing

with here?  Now, Mr. Jaimes doesn't have to submit to

that.  He's got a right to say no.  But he's not getting

out until the Court has some trained professional tell us

can we trust him or not.  Are there personality

disorders, other psychological problems or something that

either can or cannot be addressed?  That's the first

step.

If we get there from here, and the Court is willing

to countenance the fact that we will, we have to have a

tighter plan.  I'll invoke Mr. Huartt.  He was in a

halfway house.  Somehow he got access to a contraband

cell phone and was looking at pornography on a cell phone

in a halfway house under the tightest possible

restrictions.  He was in lockdown and yet he still got

access to somebody's phone.  It happens all the time.

You'd like to think it can't, you'd like to think it

1  doesn't, but I don't think Ms. Altman is out of line by

2  saying that burner phones are easy to get.

3       If you're working in a bar at a country club, you

4  can borrow someone's phone to call home and next thing

5  you know you've dialed up an internet site.  We would

6  have to account for things that tightly here because we

7  just don't know what Mr. Adrian Jaimes would want to do

8  or is capable of doing and we would have to account for

9  all of that.

10      Like the government, I very much trust his parents.

11 I think that they are very well intentioned and I trust

12 them to do whatever they need to do.  But today's concern

13 is the Court doesn't know what we need them to do.  We

14 need to find out.  We need to find out more about what's

15 going on here and what's making their son do the things

16 he's alleged to have done.  Because I'm also going to

17 assume they had no idea that this was happening, that

18 this is a complete shock and a mystery to them.  And I

19 don't hold that against them, but we have to deal with

20 the reality that confronts all of us today.  Okay?

21      So I'm going to grant the government's motion.  The

22 presumption has not been rebutted today.  I'll leave the

23 door open.  I'm not going to set deadlines on anything.

24 Mr. Moyers, if you want to follow this path a little bit

25 further, you can talk to Pretrial Services.  If you want

25

1    to get your own psych eval for whatever purpose, that's

2    your prerogative.  You've got resources.  But just keep

3    the Court in the loop if you want the Court to do

4    anything.  But today the answer is no, Mr. Jaimes is

5    staying in custody.  Okay?

6        That's all I've got.  Mr. Moyers, anything else

7    today before we adjourn?

8            MR. MOYERS:  No, Your Honor.

9            THE COURT:  Anything else on behalf of the

10   government?

11           MS. ALTMAN:  No, Your Honor.  Thank you.

12           THE COURT:  Anything else on behalf of Pretrial?

13           AGENT:  No, Your Honor.  Thank you.

14           THE COURT:  Then we're done for today.  Thank

15   you all.

16       (Proceedings concluded at 3:33 p.m.)

17

18                    *  *  *  *  *

19

20

21

22

23

24

25

26

1              I, LYNETTE SWENSON, Certified Realtime and Merit

2    Reporter in and for the State of Wisconsin, certify that

3    the foregoing is a true and accurate transcription of the

4    audio recording of the proceedings held on the 14th day

5    of June 2016 before the Honorable Stephen L. Crocker,

6    Magistrate Judge for the Western District of Wisconsin.

7    Dated this 23rd day of June 2016.

8

9

10

11                          ___/s/_____

12                          Lynette Swenson, RMR, CRR, CRC
                            Federal Court Reporter

13

14

15

16   The foregoing certification of this transcript does not
     apply to any reproduction of the same by any means unless
17   under the direct control and/or direction of the
     certifying court reporter.

18

19

20

21

22

23

24

25