UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WISCONSIN

---

UNITED STATES OF AMERICA,

    *Plaintiff*,

vs.                                                  Case No. 16-cr-62-jdp

ADRIAN JAIMES,

    *Defendant*.

---

**SENTENCING MEMORANDUM**

Adrian Jaimes should be sentenced to the statutory minimum. He's 22 years-old. He's a first-time offender. He has unusually strong support from family, friends, and his community. And his risk of recidivism is low. Based on these factors alone, a five-year sentence for someone so young will feel especially long.

But those factors aren't the end of the story—or even the beginning. Jaimes is unusual in a way that the criminal justice system doesn't like to talk about: he's extraordinarily vulnerable to prison rape. He identifies as bisexual but he prefers men. He is small. He is young. He has never been involved in the system before, let alone to prison. He is multiracial. Each of these characteristics aggravates the risk he'll be sexually assaulted during his term. These factors combined make him uniquely vulnerable to rape and virtually assure that he'll suffer humiliation and harassment other inmates don't have to. If he's lucky, his time inside will merely be terrifying. If he's not, then

rehabilitation and re-entry won't matter much for him; he'll be absorbed with putting his life back together.

### I. Jaimes's history and characteristics caution against a harsh sentence.

Jaimes is unlike the typical offender before this Court. He was just 20 years-old when he committed the crime here. He had lived with his mom and dad his entire life until the day of his arrest. His parents are loving and supportive, and the family is close-knit.[1] He graduated high school, and he has always been a hard worker.[2] There's no alcohol or drug abuse to speak of. He even loaned money to his parents when the family was having difficulty making ends meet.[3]

For someone so young, Jaimes shows an impressive understanding of the calamity he's caused.[4] There's no hint of minimization or explanation in his letter—just remorse for the people he hurt and for the family and friends he let down. He's got a long way to go, and his adult life has barely begun, but he has an emerging awareness of the challenges that lie ahead.

Fortunately, these challenges won't include Jaimes's concealing his sexuality. Part of the reason Jaimes's recidivism risk is so low is because the conditions for his crime

---

[1] *See* Letters of Support, attached as Exhibit A.
[2] *See id.*
[3] *See id.*
[4] *See* Statement of Mr. Jaimes, attached as Exhibit B.

2

FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC.

necessarily no longer prevail. Jaimes's sexuality was his "big secret," and the secret is out.[5] There's nothing left for him to hide.

Jaimes will have many long, crucial years to think about his secret life and the pain it caused. For a twenty-something, a sentence between 5 and 20 years feels longer than it does to older defendants because it's a larger fraction of a younger person's lifetime. And from an objective standpoint, his sentence's timing has more enduring effects. For most people, the decade between ages 20 and 30 is life's most dynamic; the choices and experiences during those 10 years are both formative and varied. Put another way, the changes between 20 and 30 are more profound than say, 30 and 40. And whatever sentence the Court imposes, he'll spend his decade's bulk behind bars rather than building the foundations for the rest of his adult life. He won't be going to college or building a career. Instead when he gets out he'll be looking for his first apartment and an employer that hires registered sex offenders. Given his age, he's got 60 years ahead of him to wear his digital scarlet letter with its collateral consequences.

---

[5] Dr. Nick Yackovich conducted a psychosexual evaluation of Jaimes. His report is attached as Exhibit C.

### II. Jaimes's unusual vulnerability to prison rape counsels a statutory-minimum sentence.

#### a. Jaimes's sexuality, size, age, inexperience, and race combine to make him a prime target for sexual assault.

Jaimes is extraordinarily vulnerable to being raped in prison because he bears several characteristics that aggravate his risk. He is bisexual although he prefers men. He is small in stature and build. He is young. He has never been to prison. And he is multiracial; his mother is white and his father is Mexican with mixed origins. This rare combination will make him a target in prison.

Research shows why. Until 2003 when Congress passed the Prison Rape Elimination Act, federal and state governments tolerated sexual abuse in prisons and jails, viewing it as an unavoidable consequence of incarceration. [6] Indeed Congress doesn't pass legislation that helps prisoners unless it really has to. But courts had been aware of the problem for decades prior to Congress's intervention. In the 1980's, the Supreme Court summed up the evil of government inaction: "Being violently assaulted in prison is simply 'not part of the penalty that criminal offenders pay for their offenses against society.'" *Farmer v. Brennan*, 511 U.S. 825 (1984) (quoting *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981)).

---

[6] The Act also established the National Prison Elimination Commission, which produced a comprehensive report on the problem of sexual assault in prisons and jails. The report, which runs 247 pages, is a stomach-churning read. It is available at https://www.ncjrs.gov/pdffiles1/226680.pdf. The executive summary runs 24 pages. It is attached as Exhibit D.

In 2009, the National Prison Rape Elimination Commission published its report to Congress. The Commission was led by United States District Judge Reggie B. Walton. The other commissioners included a law professor, a psychology professor, the general counsel of Corrections Corporation of America, a former federal inmate, the senior counsel for Human Rights Watch, and a former corrections administrator. The report was unambiguous in its characterization of the problem. "Until recently, however, the public viewed sexual abuse as an inevitable feature of confinement. Even as courts and human rights standards increasingly confirmed that prisoners have the same fundamental rights to safety, dignity, and justice as individuals living at liberty in the community, vulnerable men, women, and children continued to be sexually victimized by other prisoners and corrections staff." Comm'n Report at 1.

The Commission drew upon a number of findings in making its policy recommendations to Congress. These findings were based upon academic and institutional research, testimony before the Commission and Congress, and data from the Department of Justice's Bureau of Justice Statistics. *Id.* at 26-27. The findings relevant here highlight Jaimes's vulnerability. As one would expect, "[y]outh, small stature, and lack of experience in correctional facilities appear to increase the risk of sexual abuse by other prisoners." *Id.* at 7. Sexual orientation matters too. "A 1982 study in a medium-security men's facility in California, for example, found the rate of abuse was much higher among gay prisoners (41 percent) than heterosexual prisoners (9 percent)." *Id.* at 7-8.

5

Under PREA, the Justice Department's Bureau of Justice Statistics has published periodic reports on prison rape risk factors; its findings underscore Jaimes's vulnerability.[7] Its 2010 report found that multiracial inmates, like Jaimes, reported sexual victimization at a rate of 4.4%. BJS 2010 Report at 12. Whites came in a distant second at 3%. *Id.* Multiracial inmates were over three times as likely as African-American inmates to report being sexually assaulted by another inmate. *Id.* The study also found that multiracial inmates were 60% more likely than white inmates to suffer sexual abuse by staff. *Id.* at 18. Unsurprisingly, its data showed that 18-19 year-olds were the most at-risk age group; it had a victimization rate of 4.7%. But 20 to 24 year-olds, like Jaimes, were at 3.4%. *Id.* at 18.

The BJS's 2012 report highlight Jaimes's sexuality as an additional risk factor.[8] "Among heterosexual males, an estimated 3.5% reported being sexually victimized by another inmate. In comparison, among males who were bisexual, 34% reported being sexually victimized by another inmate. Among males who were homosexual or gay, 39% reported being victimized by another inmate."

Academic studies have echoed the BJS's conclusions. "LGBT inmates are the 'chief targets' of prison rape and the 'most vulnerable.'" Russell K. Robinson, "Masculinity as

---

[7] Bureau of Justice Statistics, U.S. Dep't of Justice, Office of Justice Programs, *Sexual Victimization in Prisons and Jails Reported by Inmates, 2008-09* (2010) ("BJS 2010 Report"). The report runs 91 pages. It is available at https://www.bjs.gov/content/pub/pdf/svpjri0809.pdf.

[8] Bureau of Justice Statistics, U.S. Dep't of Justice, Office of Justice Programs, *PREA Data Collection Activities, 2012* (June 2012) ("BJS 2012 Report"). The report is attached as Exhibit XX. It is also available at https://ojp.gov/reviewpanel/pdfs /prea_finalreport_2012.pdf.

6

Prison: Sexual Identity, Race, and Incarceration," 99 *California Law Review* 1309, 1356 (2011). Specifically, "[t]he victims of prison rape are usually targeted for being unmasculine: [t]hey tend to be gay, bisexual, transgendered, young, small, weak, or effeminate." Kim Shayo Buchanan, "Our Prisons, Ourselves: Race, Gender and the Rule of Law," 29 *Yale Law & Policy Review* 1, 13 (2010). One study showed that "67 percent of inmates who identified as LGBTQ reported having been sexually assaulted by another inmate during their incarceration, a rate that was 15 times higher than the inmate population overall.'" Sharon Dolovich, "Strategic Segregation in the Modern Prison," 48 *American Criminal Law Review* 1, 2 (2011).

As awful as sexual assault is, it results in unique harms in the institutional setting. For male victims, physical injury usually accompanies an assault. "A study of incarcerated men showed that more than half of all sexual assaults resulted in physical injury. Moreover, the study found that internal injuries and being knocked unconscious were more common outcomes of sexual abuse than of other violent encounters in prison." Comm'n Report at 14. The Commission went on to detail the typical physical injuries from prison rape. "Depending on the degree of force, the size of the perpetrator in relation to the victim, and any weapons involved, physical injuries can include bruises, lacerations, bleeding, broken bones, concussions, knocked-out teeth, internal injuries, and even more serious physical damage." *Id.* at 129.

7

The long-term physical health consequences of rape can be disastrous. "The trauma can also lead to serious medical conditions, including cardiovascular disease, ulcers, and a weakened immune system. Studies indicate that sexual abuse victims have poorer physical functioning in general and more physical ailments than nonabused individuals, even after controlling for emotional disturbances such as depression." *Id.* at 14.

Sexual victimization undermines rehabilitation because it adds to the mental health challenges an inmate may already face before re-entry. It's an enormous setback for individuals who already have a lot of ground to make up. The psychological harms "include posttraumatic stress disorder, anxiety disorders, fear of loud noises or sudden movements, panic attacks, and intense flashbacks to the traumatic event. Each of these consequences alone has the ability to re-traumatize victims for years." *Id.*

What's worse is that even the threat of prison rape leads to intense suffering. "The Commission is concerned that correctional facilities may rely on protective custody and other forms of segregation (isolation or solitary confinement) as a default form of protection." Comm'n Report at 8. And the Commission learned that desperate prisoners sometimes seek out segregation to escape attackers. Gay men must do everything possible to conceal "their sexual orientation toward other men, since to be outed is to become an immediate mark for sexual victimization." Dolovich at 18. Secrets don't survive long in prison, and so LGBQT inmates are often forced to either fight, be victims,

or leave the general population for segregation. *Id.* at 44. "Serving time under these conditions is exceptionally difficult and takes a toll on mental health, particularly if the victim has a prior history of mental illness." *Id.* at 8. Isolation is a spirit-killer. But sometimes institutional indifference means segregation isn't even an option. "National studies have found that a significant number of correctional officers believe that homosexual inmates should not be protected from rape or that if homosexual inmates are raped, they got what they deserved." BJS 2010 Report at 48 n.494.

Prison culture makes improvement during Jaimes's prison term unlikely. "Men's correctional facilities tend to have very rigid cultures that reward extreme masculinity and aggression and perpetuate negative stereotypes about men who act or appear different." Comm'n Report at 73. Topping the list are "gay, bisexual, and gender-nonconforming individuals." *Id.* Such inmates "are often the targets of sexual abuse precisely because the dominant 'straight' males expect and demand submission." *Id.* The culture's pathology is particularly entrenched given that some prison staff "erroneously assume that inmates who are homosexual or presumed to be homosexual are consenting to the sexual act, which may cause them to ignore those incidents." *Id.* (quotation omitted).

      **b.**    **Jaimes's vulnerability is a recognized basis for reducing his sentence.**

Courts, even before *Booker*, recognized a defendant's vulnerability to abuse in prison as a basis for a reduced sentence. In 1996, the Supreme Court acknowledged that

9

"susceptibility to abuse in prison" was a proper basis to depart from the then-mandatory guidelines range. *Koon v. United States*, 518 U.S. 81, 111-12 (1996). In *United States v. Lara*, 905 F.2d 599 (2d Cir. 1990), the Second Circuit noted that the defendant's youthful appearance and admitted bisexuality made him vulnerable to sexual abuse in prison. Thus, the district court was justified in reducing his sentence under Section 3553(a). *Id.* at 603. The next year, it affirmed a district court's reduction of the defendant's sentence because the "feminine cast to his face and a softness of features [made] him prey to the long-term criminals with whom he will be associated in prison." *United States v. Gonzalez*, 945 F.2d 525, 526-527 (2d Cir. 1991). The Ninth Circuit upheld a reduction based in part on the defendant's stature, demeanor, and naïveté because it made him more vulnerable to abuse in prison. *United States v. Parish*, 308 F.3d 1025, 1031 (9th Cir. 2002).

The Seventh Circuit, following *Koon*, recognized that vulnerability to abuse in prison is a proper basis for a sentence reduction. *United States v. Wilkie*, 156 F.3d 749, 753 (7th Cir. 1998). Citing *Lara*, the court held that while a defendant's crime itself cannot serve as a basis for a guidelines departure, "the district court may consider [a defendant's] sexual orientation and demeanor." *Id.*

After *Booker* a defendant's sentence must account for his vulnerability to prison rape because it directly implicates two of the four sentencing goals. Section 3553(a) sets forth "the four purposes of sentencing: retribution; deterrence; incapacitation; and

rehabilitation." *United States v. Milbourn*, 600 F.3d 808, 812 (7th Cir. 2010). Prison rape bears on rehabilitation and retribution.

The specter of sexual abuse itself may thwart Jaimes's rehabilitation. Dr. Yackovich's report details his mental health challenges and concludes that his recidivism risk is low. The report makes three recommendations to further reduce this risk: mental health treatment to help him become comfortable with his sexual identity; developing skills for establishing healthy and age appropriate relationships; and educational support and career development. Yackovich Report at 8. It's an understatement to state that a sexual assault would interfere with these activities because "posttraumatic stress disorder, anxiety disorders, fear of loud noises or sudden movements, panic attacks, and intense flashbacks to the traumatic event" result in more dire and urgent mental health challenges. *See* Comm'n Report at 14. Protective custody won't help his mental health either because isolation or segregation will exacerbate, rather than remedy, his problems.

Vulnerability to prison rape's bearing on retribution may seem obvious but the details are worth exploring here. The principle underlying a sentencing reduction for vulnerability to sexual assault is that at-risk inmates do harder time than those without the risk factors. A convicted defendant "might deserve two years' incarceration for his offense, but his punishment is not proportionate to his offense if those years included being raped four times." Bennett Capers, "Real Rape Too," 99 *California Law Review* 1259, 1303 (October 2011). The problem is that courts effectively have no power over a

11

defendant's confinement conditions. "Courts have rather limited control over the kinds of facilities to which inmates are assigned." Adam J. Kolber, "The Subjective Experience of Punishment," 109 *Columbia Law Review* 182, 195 (January 2009). Instead, judges make sentencing decisions "while decisions about conditions of incarceration are usually made by prison bureaucrats (under conditions that are generally less open, accountable, and reviewable than they are in the courtroom)." *Id.* By dividing responsibilities between courts and prison administrators, "we dramatically limit opportunities to calibrate punishments." *Id.*

Jaimes thus years ahead of him that are totally unlike the ordinary inmate's. For the vulnerable and terrified, hours seem like days, days seem like months, and months seem like years. A sentence of 60 months may be the longest five-year sentence this court has ever imposed.

Dated at Madison, Wisconsin, this 9th day of January, 2017.

Respectfully submitted,

**/s/ Peter R. Moyers**
Peter R. Moyers
Counsel for Mr. Jaimes

FEDERAL DEFENDER SERVICES
 OF WISCONSIN, INC.
22 East Mifflin Street, Suite 1000
Madison, Wisconsin 53703
Tel: 608-260-9900
Fax: 608-260-9901
peter_moyers@fd.org