

# MIDWEST CENTER FOR PSYCHOTHERAPY & SEX THERAPY

**Nick Yackovich, PhD, S.C.**

6300 University Avenue • Suite 125 • Middleton, WI  53562 (P) 608-310-5482 • (F) 608-237-8005 • www.midwestcentertherapy.com

## Psychosexual Evaluation

Name:                        Adrian Jaimes
DOB:                         11/11/1994
Date of Assessment:          12/12/2016
Date of Report:              12/21/2016

**Reason for Referral**:
Attorney Peter Moyers, Associate Federal Defender with the Federal Defender Services of Wisconsin, Inc., contacted this evaluator and requested that a psychosexual evaluation be conducted with his client, Adrian Jaimes. The function of this evaluation was designed to assess sexual dysfunction, calculate risk for future sexual misbehavior, and establish a mental health profile.

*Source(s) of information:*                                *Date:*
Client interview                                           12/12/2016

*General Assessment Measures:*                             *Date:*
Symptom Checklist – 90 (SCL-90)                            12/12/2016
Test of General Reasoning Ability (TOGRA)                  12/12/2016

*Risk Assessment Measures:*                                *Date:*
Static-99r                                                 12/12/2016
Sexual Violence Risk – 20 (SVR-20)                         12/12/2016

*Additional Material Reviewed for this Evaluation:*
Discovery including transcripts of texts communication involved with this case and transcripts of interview with law enforcement.

**Informed Consent:**
Adrian Jaimes was interviewed on 12/12/2016 for the purpose of conducting a psychosexual evaluation. The purpose of the interview was explained to Mr. Jaimes and the limits to confidentiality were discussed. The process for conducting the psychosexual evaluation was outlined for Mr. Jaimes and he was given the opportunity to ask questions in regard to the evaluation procedure. It was also explained to Mr. Jaimes that the report prepared as a result of this evaluation would be shared with his legal team. It was explained that his legal counsel and he could determine who the evaluation would be shared with in the future, and that the content of the evaluation report might be shared with the court and used in decisions regarding his current offenses. He appeared to understand the guidelines and limits to confidentiality. He voluntarily agreed to participate in the assessment.

Psychosexual Evaluation
Jaimes, Adrian
12/21/2016

**Relevant Background:**
Adrian Jaimes, the subject of this report, was born on 11/11/1994 in McHenry, IL. He was raised by his parents, Ruth and Catalino Jaimes, with his older sister (one year older) and a younger sister (8 years younger). The family lived in McHenry, IL (1994-1999); in Fox Lake, IL (1999-2000) in Round Lake, IL (2000-2003); Wisconsin Rapids, WI (2003-2005); and Nakoosa, WI from 2005 until the present. Mr. Jaimes stated that in 2003, his immediate family and a large contingent of his extended family migrated to Wisconsin to be with his maternal grandmother, who had breast cancer. Mr. Jaimes reported that is family is "very close", so when this move took place, seven sets of aunts and uncles, as well as cousins, were part of the migration.

Mr. Jaimes described his early developmental years as "normal", explaining that there was no forms of abuse or significant traumas. He shared that he spent a fair amount of time in the outdoors, and "hung out" with his older sister and cousins. Mr. Jaimes shared that he didn't have any issues with making friends in school and added that "teachers loved me". He reported that through elementary school he earned good grades, experienced no formal discipline for poor behavior, and had a wide range of friends. Mr. Jaimes stated that he "fit in with everybody".

Mr. Jaimes stated that he did have some conflict in middle school, following the move from Illinois to Wisconsin. He stated that in the 6th grade he was often harassed by a female peer who, according to his report, acted like she was "better than…" him. Mr. Jaimes shared that on one occasion he became so irritated by this female peer that he told her he would "bring a gun to school and shoot her". Mr. Jaimes stated during his interview that he had no plan of bring a gun to school, and was "just trying to get her to leave [him] alone." As a result of the threat, Mr. Jaimes was asked to go to the principal's office. Ironically, Mr. Jaimes reported that this female and he became friends the following school year. They remained friends until she moved to Florida in their 8th grade year. Mr. Jaimes stated that he earned average grades in senior high school and graduated from high school in 2013.

Mr. Jaimes reported that both of his maternal grandparents passed away, (his grandmother around the time the family moved to Wisconsin and his grandfather in 2011) which marked the period of conflict within his family. Mr. Jaimes believes this was likely due to some tension and conflict generated around the "dividing of the family heirlooms". He also shared that a cousin stole his grandfather's gun collection, which was part of the "heirloom" collection that was to be shared by the family. He reported that law enforcement was not involved and the family dealt with the situation "within the family".

Mr. Jaimes reported that his father is a chef at a local country club and his mother has worked for Head Start in a variety of roles. Mr. Jaimes reported that he has also worked at the same country club as his father, as a dishwasher at age 16; bussing tables at age 17; and then working as a server and bartender from age 18 until the present. Mr. Jaimes shared that he aspires to attend college and study business and hotel management.

**Psychosexual Assessment:**
Mr. Jaimes shared that he first noticed that he was interested in sex at the time he was entering the 6th grade (about the same time that he was starting puberty). He shared that while in IL, the friends he spent time with never talked about sex, but once he moved to WI it seemed that "everyone knew about sex". Mr. Jaimes shared that he doesn't remember sex ever being discussed in his home. He reported that the first time he masturbated was around the ages of 12-13. He confided that his fantasies at that time involved females the same age as him. Mr. Jaimes stated that he began to identify as bi-sexual around the age of 14. At that time he noticed that he

2 | P a g e

Psychosexual Evaluation
Jaimes, Adrian
12/21/2016

was attracted to both his male and female friends. Mr. Jaimes was asked to discuss his history with viewing pornographic material. He stated that when he was in the 8th grade a friend gave him a Playboy Magazine. He added that he first viewed Internet porn ate the ages of 14-15, but added that he was viewing "still images" (not videos) at that time, and his frequency was about once every 1-2 weeks. Mr. Jaimes stated that he started to view videos of erotic, sexual material when he was age 17. He stated that he viewed sites such as "PornHub" and viewed adult, consensual images of heterosexual or lesbian content. Even though Mr. Jaimes shared that he began to identify as bi-sexual at the age of 14, and stated viewing pornography on the Internet around the same time, he didn't start viewing "gay porn" with male images until he was ages 19-20. He stated that his viewing of gay porn to heterosexual porn was about "50/50".

Mr. Jaimes reported that his first sexual experience with a partner was at the age of 16-17 and involved a female friend named "Lindsey", who was about the same age as him. He stated that Lindsey and he were in the same math class and began "flirting" with each other. According to his report, the flirting eventually led to sexual contact, and on one occasion they experienced penis to vagina intercourse and on another occasion they experience oral sex, her performing oral sex on him. Mr. Jaimes shared that after Lindsey and he had been sexual with each other, they decided they were better as "just friends", so the sexual contact ended. His next relationship involved a female named "Kyrea" who he had known since the 6th grade. Mr. Jaimes stated that this relationship was not sexual, and he was more of a "support for her" following a "violently abusive" relationship with her previous boyfriend. Mr. Jaimes shared that his next sexual contact was with a male friend named "Brett", which occurred when they were both 20 years of age. Mr. Jaimes stated that he performed oral sex with Brett and consented to penis to anus sex with him. As was the case with his first sexual encounter, Mr. Jaimes and Brett have remained friends, but are no longer sexually active with each other. Mr. Jaimes denied any other incidents of physical contact of a sexual nature with a partner.

Mr. Jaimes reported that he his primary sexual outlet/release is done through the use of erotic material from the Internet as masturbatory stimuli. He confided that he accesses pornography through the computer for approximately 5-10 hours a week, on average. He also shared that he has engaged in sexually-related discussions and video interactions through the computer. He reported that he most frequently uses a search engine titled "Omegle," which facilitates interpersonal contact that can be sorted as "clean" (general chat and friendship option) or "dirty" (sexually explicit, erotic option). Mr. Jaimes stated that his understanding of the Omegle user guidelines is that one must be 18 years of age to participate in interactions through the "dirty" option of communication.

It seemed clear to this evaluator that Mr. Jaimes was trying to become comfortable with his sexual identity. He shared that his family was not aware of his sexual attraction to males until his recent charges were filed. He identifies has bi-sexual, but admitted that he has "leaned more toward gay" in the last few years. Mr. Jaimes was asked if he used dating sites designed for gay males looking for partners. He stated that he his friend Emily, one of the few people in his circle of support that knows that he is gay, had connected him with a dating website. Mr. Jaimes shared that he "never really used it", adding that he finds them awkward. Mr. Jaimes stated that "flirting with strangers" is less intimidating than "starting a relationship".  It is fair to note that each of his prior sexual partners were longer-term friends that he had known for some time before having sexual contact. He also added that from a cultural and family perspective, the concept of displays of affection are also awkward for him. On his mother side of the family open displays of affection are not common. Mr. Jaimes says that the only one from this side of his family who "hugs" is his mother. His father's side of the family, who identify culturally as Mexican American, are "very

Psychosexual Evaluation
Jaimes, Adrian
12/21/2016

touchy", with open displays of affection being excessive ("overload") and therefore, equally uncomfortable for him. He reported that growing up with these two extreme ends of the affection continuum has led to his developing an "aversion to touch". Mr. Jaimes added that he feels certain that his family would not support a gay lifestyle. He explained that his father's family is "very religious" and being gay is not really considered an option as a sexual identity. He reported that his mother's family are from rural West Virginia, and openly make disparaging remarks about people that are gay. Mr. Jaimes shared that he remembered an occasion when his older sister stated that she felt she might be attracted to other females, and the family reacted "negatively", as if she was engaged in an act of "betrayal". Mr. Jaimes recalled that he knew from that point on that his sexual identity was not something that he could share openly. Mr. Jaimes went on to say that of all the people that know him, friends or family, only Brett and Emily are aware of his attraction to males. Mr. Jaimes' aversion to touch, discomfort with open displays of physical affection, and compulsion to keep his sexual identity a secret has each reinforced his perceived benefit of a "technological" and distant connection with others.

**Psychological and Cognitive Assessment:**
*Psychological Functioning*
Along with the clinical impression obtained through the interview and record review, psychological testing was done using a measure of general psychopathology. The measure of general psychopathology used by this evaluator was the Symptom Checklist-90-R (SCL-90-R). The SCL-90-R is a multidimensional tool that assesses nine symptoms of psychopathology and provides three global distress indices. The primary symptom dimensions that are assessed are somatization, obsessive-compulsive, interpersonal sensitivity, depression, anxiety, hostility, phobic anxiety, paranoid ideation, and psychoticism. The three indices are global wellness index, hardiness, and symptom free.

The scoring procedure for the SCL-90-R recommends that statistically derived scores of "60 or higher" be considered in the clinically significant range (i.e., potential need for intervention). Mr. Jaimes' scores that would meet this threshold were:

Depressive Mood = 69
Anxiety = 64
Hostility = 62
Psychoticism = 64

This psychological profile from Mr. Jaimes' responses with the SCL-90-R is indicative of one that struggles with a combination of depressive and anxious distress, as well as a sense of mistrust and alienation from others. Mr. Jaimes denied a prior history of mental health treatment or diagnosis. His profile schools are likely an indication of his current stress. This current stress is aligned with his state of being involved with the criminal justice system for the first time and as the result of a serious criminal charge. This stress is coupled with the fact that his arrest and subsequent involvement with the criminal justice system has also brought to light his gay sexual identity for the first time. Although Mr. Jaimes' profile scores indicate a fair degree of psychological distress, his affect and interpersonal demeanor is quite reserved and calm. This is often an indication of 1) an individual who has not yet connected to the emotional aspects of their distress, 2) an individual who has been overwhelmed by the emotional aspects of their distress, and have reached a certain level of acceptance, and/or 3) a combination of both. During the clinical interview, Mr. Jaimes explained that he knows what he did was wrong and that there will be consequences for his behavior. He stated that he believes he is ready to face these consequences the best that he can. A side note from a professional and clinical perspective is that,

Psychosexual Evaluation
Jaimes, Adrian
12/21/2016

at times, even when there are consequences and negative aspects of a situation such as this, the fact that "the big secret" is now revealed can produce a conscious or subconscious sense of a burden being lifted. This is not presented as a distraction from the potential harm to the victim in this case, or as a motive for the behavior involved with this case, but more as an explanation for the sense of ease with which Mr. Jaimes appears to have experienced in spite of his negative circumstances.

### *Cognitive Functioning*

Intelligence testing was not indicated for this assessment due to the observed intellectual functioning of the interview subject. The initial clinical impression is that Mr. Jaimes functions at the high average range of intellectual potential. During the interview, Mr. Jaimes did not impress as having any delusional thought or other formal thought disorder as evidenced by his ability to track thoughts and respond in an appropriate manner. He approached the evaluation in a very cordial and cooperative manner.

Mr. Jaimes was appropriately groomed and displayed good hygiene, considering he is currently detained in the Sauk County Jail. He maintained good eye contact with the interviewer and appeared to understand the questions presented. Rapport was established easily.  His range of emotional expression was within normal limits and appropriate to content. Mr. Jaimes denied perceptual disturbances, such as hallucinations, and there was no evidence of such. Generally, his thoughts are well organized and goal directed.

Mr. Jaimes was alert with no apparent impairment in the areas of attention and concentration. He was oriented to time, place, person, and situation. There was no evidence of deficits in the area of short and long term memory processing.

Mr. Jaimes seemed to have reasonable insight into his situation and possible outcomes. Mr. Jaimes displayed the capacity for positive judgment and displays a clear capacity for empathy and concern for the well-being of others.

The measure of cognitive functioning (i.e., ability to reason and process information) used in this evaluation was the Test of General Reasoning Ability (TOGRA). The TOGRA is a speeded measure of reasoning ability and problem-solving skills that is standardized for use with subjects from ages 10 to 75 years. The TOGRA consists of items that assess verbal, nonverbal, and quantitative reasoning and problem-solving skills through tasks that are inductive as well as deductive in nature. Mr. Jaimes earned a general reasoning index (GRI) score of 113, with a 95% confidence interval placing his true score between 104 and 120. His score falls within the "average" range of scores and within the 81st percentile of the sample for which this measure was normed. This suggests that Mr. Jaimes has an above average capacity for processing multiple pieces of information in a constructive and logical manner. It is also an indication that Mr. Jaimes as an ability to engage in abstract problem-solving. Often referred to as "fluid intelligence" or "fluid reasoning" (i.e., sometimes referred to as "being able to think on your feet"), this cognitive function is evident in one's ability to think logically and solve problems in novel situations, independent of acquired knowledge. It is the ability to analyze novel problems, identify patterns and relationships that underpin these problems and the extrapolation of these using logic. An illustration of this skill would involve an individual being able to prepare themselves for a future event based on their acquisition of knowledge from similar past events. This process relies less on one's memory and more on the skill of information processing and information categorization to be cognitively accessed in the conceptualization of new situations. Mr. Jaimes above average performance with this measuring is an encouraging sign that he would likely benefit from

5 | P a g e

Psychosexual Evaluation
Jaimes, Adrian
12/21/2016

therapeutic interventions, which by design require the participant to generalize clinical material to their everyday circumstances.

**Index Event:**
The details of the current charges for Mr. Jaimes have undoubtedly been made available for the court and outlined in the Criminal Complaint and Presentence Investigation Report[1]. Therefore, they will not be repeated in detail in this section of the report, but will be summarized as a context for Mr. Jaimes' perspective, insights, and explanations.

Mr. Jaimes shared that while interacting with individuals on line, he connected with a person that he believed to be an adult male "from a European country[2]" who wanted to exchange pictures of an erotic or sexual nature. Mr. Jaimes admitted that he sent a few pictures of himself in the nude to this individual. Mr. Jaimes stated that this was the first time that he was exposed to this type of interpersonal exchange. At a later point (approximately the late summer, early fall of 2015) Mr. Jaimes engaged in an on-line communication with a young male that he believed was 12-13 years old. He stated that he first came in contact with this individual on "Instagram", when the young male posted a photo from a location in IL familiar to Mr. Jaimes. Mr. Jaimes admitted that the communication eventually involved his posing as a younger female (posing as his younger sister) in order to obtain explicit photos from the young male, who he later found out was 11 years of age (this activity apparently took place though the use of the "KiK" app.). When asked to discuss his motives or reasoning involved with engaging in this type of behavior, Mr. Jaimes stated that the "dark" aspect of the behavior was intriguing to him. He added that he viewed the perspective of the youth from his own perspective at that age, when his sexual curiosity was increasing. He denied ever expecting to try and make physical contact with this individual. Mr. Jaimes denied engaging in this type of behavior with other minors. He admitted that he did exchange photos, including those of his victim, with other males as a form of currency to obtain different pictures for himself.

It appears that the minor's mother found the photos and exchanges on her son's computer and notified authorities. The case was referred to federal investigators in February of 2016, which led to the arrest of Mr. Jaimes in June of 2016.

**Criminal History (other than Index Event):**
There does not appear to be any other arrests or convictions in Mr. Jaimes adult and juvenile history.

**Risk Assessment:**
As stated at the beginning of this report, the primary referral target for this evaluation is assessing sexual dysfunction, risk for future sexual misbehavior, and establishing a mental health profile. It is within this context that the following psychosexual conceptionalization of Adam Jaimes is presented. There were two empirically supported assessment tools that were utilized for examining this area of functioning. The instruments used to assess the risk of sexual re-offense in this assessment were the Static-99r and the Sexual Violence Risk-20 (SVR-20) assessment.

---

[1] Presentence Investigation Report, Docket No.: 0758 3:16CR00062-001 prepared by Richard A. Williams, Sr. U.S. Probation Officer.
[2] Mr. Jaimes stated he assumed this person was from Europe on the background of the some of the photos exchanged and the "time difference" intimated in the communication with this individual.

The Static-99r is a 10-item test that utilizes static (unchangeable) factors that have been seen in the literature to correlate with sexual reconviction in adult males. The estimates of sexual and violence recidivism produced by the Static-99r can be thought of as a baseline of risk for violent and sexual recidivism. Mr. Jaimes earned a score of "2" (1 point for his age, 18-34.9; and 1 point for having an unrelated victim) on the Static-99r which would place him in the "Average risk" range. More specifically, of the subjects who were used in the research establishing the base rates for recidivism for sexual crimes with the Static 99r, those who earned a score of "2" were in the 5.6 percentile of predicted recidivism (the 95% confidence interval for the score of 2 ranges between 4.8% and 6.5%) over a 5-year period. This can be interpreted to mean that over a 5-year period, of the subjects with scores similar to Mr. Jaimes, over 94% did not commit another sex crime.

The SVR-20 is a 20-item checklist of risk factors for sexual violence that were identified by a review of the literature on sex offenders. The checklist was developed to improve the accuracy of assessments for the risk of future sexual violence. Sexual violence is defined broadly as "actual, attempted, or threatened sexual contact with a person who is non-consenting or unable to give consent". The SVR-20 specifies which risk factors should be assessed and how the risk assessment should be conducted. The 20 factors essential in a comprehensive sexual violence risk assessment fall into three main categories: Psychosocial Adjustment, History of Sexual Offences, and Future Plans. The actual risk for sexual violence depends on the combination (not just the number) of risk factors present in a specific case. Coding of the SVR-20 involves determining the presence/absence of each factor and whether there has been any recent change in the status of the factor. This item-level information is integrated into a summary judgment of the level of risk (Low, Moderate or High), which can easily be translated into an action plan.

Mr. Jaimes can be considered a low risk for future sexually violent behavior according to his profile obtained by utilizing the SVR-20. Variables contributing to this finding include the fact that Mr. Jaimes has no prior sexual misbehavior in his record, does have a history of age appropriate sexual behavior, shows no evidence of a deviant sexual interest, has realistic plans for the future, and is motivated to address the issues related to his overall mental health.

When considering risk factors it is considered equally important to also consider the protective factors, or those variables that may mitigate the risk of future criminal behavior. Research in this area identifies three categories of protective factors: Internal Factors, Motivational Factors, and External Factors. The Internal Factors include intelligence, secure attachment in childhood, empathy, coping, and self-control. Motivational Factors include work, leisure activities, financial management, motivation for treatment, attitudes toward authority, life goals, and medication. The External Factors include social network, intimate relationship, professional care, living circumstances, and external control. Although it was beyond the scope of this evaluation to identify all of the protective factors associated with Mr. Jaimes, several of the above factors can be identified as relevant to his future prognosis. Some of these protective factors include: intelligence (based on his clinical impression and testing results); secure attachment in childhood; a lack of prior criminal history; and living circumstances (stable housing with supportive, non-criminal family members).

**Summary and Conclusion:**
Based on the information gathered from the interview and testing impressions obtained for this risk assessment, it is my professional opinion that Mr. Jaimes is a **low risk to engage in future sexually criminal behavior.** He presents as one who realizes the potential ramifications of his past behavior and displays a reasonable willingness and effort to avoid future occurrences. The

following intervention suggestions would likely serve as protective factors that, if addressed, would like further reduce Mr. Jaimes' risk of future involvement with the criminal justice system:

1. Treatment involvement to assist Mr. Jaimes in establishing a level of comfort with his sexual identity;
2. Treatment involvement to assist Mr. Jaimes in learning the requisite skills for establishing a healthy and age appropriate relationship; and
3. Support toward further developing his education and career aspirations.

Report Completed by:

*[signature]*

Nick Yackovich, PhD
Licensed Psychologist
WI-Lic. # 2755-057